# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 35827

| | |
|---|---|
| **STATE OF IDAHO,** | **Boise, September 2011 Term** |
| **Plaintiff-Respondent,** | **2013 Opinion No. 41** |
| **v.** | **Filed: April 1, 2013** |
| **HECTOR B. ALMARAZ, JR.,** | **Stephen W. Kenyon, Clerk** |
| **Defendant-Appellant.** | **SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION FILED ON MAY 31, 2012 IS HEREBY WITHDRAWN** |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Payette County. Hon. Gregory M. Culet, District Judge.

The judgment of conviction is <u>vacated and a new trial is ordered</u>.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant. Jason Pintler argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth Jorgensen argued.

_____

BURDICK, Chief Justice

Hector Almaraz appeals from his conviction for first-degree murder. He appeals based on several evidentiary grounds. First, he argues that the district court abused its discretion by admitting impermissible character evidence that gang members commit crimes and other violent acts and by admitting improper testimony from a police officer and an expert witness interpreting the security video from the scene of the crime. Almaraz also argues that the district court erred in failing to suppress an eyewitness identification due to suggestive procedures, and by precluding an expert from opining to the suggestiveness of a specific eyewitness' identification. Finally, he contends that the cumulative effect of the errors deprived him of a fair trial, and that

1

this Court should remand the case to the district court for a new trial. We vacate Almaraz's conviction and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hector Almaraz and Thomas Salazar, both members of the gang Brown Magic Clique ("BMC"), attended the Club 7 bar on April 23, 2006. The bar was equipped with sixteen video surveillance cameras which showed that a fight erupted after Almaraz punched another patron, Gabriel Flores. Just thirty seconds after the brawl began, the video cameras depict Flores flailing his arms in the air and stumbling to the ground. Although the video does not clearly portray the shooting or identify any patron with a gun, it does show Almaraz behind Flores just before he was shot. Flores died in the hospital as a result of a gunshot wound to his back. Almaraz was subsequently charged with first-degree murder in the shooting death of Flores.

Ken Hust was a patron at the Club 7 bar on the night of the shooting. Three days after the shooting, Hust met with police about the events of that evening. Hust was initially apprehensive and reluctant to speak with the police. At first, Hust told police officers that he did not see the shooter. In an effort to calm Hust's fears and encourage him to talk, the officer conducting the interview, Officer Sloan, told Hust "we caught the guy that did the shooting." Hust then explained that he might be able to recognize the shooter if he saw his face. Officer Sloan left the interview room to retrieve a photo to be used as a photographic lineup and turned off the tape recorder. Officer Sloan testified that upon returning with the photograph, Hust's face went blank as if he had seen a ghost and identified Almaraz without hesitation. The photograph obtained by Officer Sloan and presented to Hust was not a typical photo lineup. Instead of several discrete pictures of different individuals, the photo used was a group photograph of Almaraz and seven other Hispanic men. Almaraz is in the center of the photo with a chandelier hanging directly above his head.

Before trial, the defense moved to suppress Ken Hust's eyewitness identification arguing that the overly suggestive procedures the police used to obtain the identification violated Almaraz's due process rights. Specifically, Almaraz argued that Hust's identification was unreliable because of Officer Sloan's interview procedures, the suggestiveness of the group photograph used as the "photographic lineup," and Hust's lack of opportunity to adequately observe the shooter at the time of the incident. The district court denied Almaraz's motion to suppress. The district court allowed the defense to present expert testimony from Dr. Daniel

Reisberg, a cognitive psychologist, about the types of suggestive procedures that can render an eyewitness identification unreliable. In his testimony before the jury, Dr. Reisberg identified proper guidelines regarding witness interviews and identified specific types of police conduct that could compromise a witness's memory. The court allowed Dr. Reisberg to testify specifically about the suggestiveness of the group photograph the police showed to Hust, but not about the suggestiveness of Officer Sloan's interview procedures.

Also prior to trial, the State filed a motion in limine seeking to admit evidence at trial of Almaraz's gang affiliation and the criminality of BMC generally under I.R.E. 404(b) to support its theory of motive. The State argued that the shooting was not merely a random killing, but that Almaraz shot Flores because of gang rivalry. The State asserted that Flores was shot because he was wearing a red jersey, which symbolized the color of a rival gang. Almaraz objected to such testimony during the pre-trial hearing and at trial on the ground that its probative value was substantially outweighed by its prejudicial effect. The district court ruled that evidence of Almaraz's gang affiliation was relevant to the issue of motive and, after applying a balancing test, the court found that the probative value was not outweighed by the prejudicial effect.

The district court allowed Tommy Salazar and another former member of BMC, Armando (Milo) Landin, to testify about the criminality of BMC. Landin testified that BMC's criminal purpose was "basically selling drugs and violence." Salazar testified about Almaraz's membership in BMC, general criminal conduct of BMC gang members, and the events that took place with Almaraz on the night that Flores was killed. Specifically, Salazar testified that the colors blue and brown symbolized membership in BMC and that the color of one of the gang's rivals was red. When recalling the details leading up to the fight, Salazar, who was standing near Almaraz in the bar, testified that Almaraz asked Flores why he was wearing a red shirt and inquired about which gang Flores claimed. Flores explained that he was not representing any gang, but simply liked the red Chicago Bulls jersey he was wearing. According to Salazar, Almaraz then asked Flores to remove the jersey. When Flores refused to take off his red jersey, a fight immediately broke out, which ended when Flores was shot in the back.

The State then presented Officer Jason Cantrell to testify as an expert on gangs. Officer Cantrell testified about the criminal and violent crimes generally committed by street gangs. His testimony was not specifically related to BMC or any of its members. Almaraz objected to the

3

State calling Officer Cantrell as an expert on "what gang life is like" in general. After the court allowed Officer Cantrell to give his expert opinion testimony about gangs, the defense moved for a mistrial, or alternatively to have the entire testimony stricken from the record, arguing that the State failed to prove that BMC was in fact a criminal street gang with the primary purpose to commit crimes.

The State called Lieutenant Stephanie Steele, an officer who was called to duty on the night of the shooting, to review the bar's surveillance video tapes. The defense objected to Lieutenant Steele's characterization of the video when she testified, on re-direct examination, that Almaraz appeared to be in what she called a "shooter's crouch" just before Flores was shot. The defense argued that such an interpretation invaded the province of the jury.

The State also called Grant Fredericks to testify as a video expert to assist the jury in accurately interpreting the bar's surveillance videos from the night of the murder. When testifying to his impression of optimized versions of the surveillance videos, the State asked Fredericks if he had formed an opinion about when Flores was shot. The defense objected, arguing that Fredericks' background in analyzing hundreds of videos was not a sufficient foundation to testify about a person's physiological reaction to being shot. The defense further argued that the question went to the ultimate issue of the case and thereby invaded the province of the jury. The district court allowed Fredericks to give his opinion about the particular video frame that depicts the victim's response to being shot.

The jury returned a verdict that Almaraz was guilty of first-degree murder. On September 26, 2008, Almaraz was sentenced to life imprisonment with 40 years fixed. Almaraz filed a motion for a new trial which was subsequently denied by the district court. Almaraz timely filed a notice of appeal against his conviction and sentence on October 31, 2008.

## II. ISSUES ON APPEAL

1. Whether the district court abused its discretion by allowing the jury to hear character evidence regarding the criminality of BMC and the criminality of gangs generally.

2. Whether the district court erred in failing to suppress Hust's eyewitness identification as unreliable due to suggestive practices used by the police.

3. Whether the district court abused its discretion by preventing the defense expert, Dr. Reisberg, from testifying about the specific interview procedures used by the police during Hust's eyewitness identification.

4

**4.** Whether the district court abused its discretion by allowing Lieutenant Steele's testimony interpreting the surveillance video and describing Almaraz's stance just before Flores was shot as a "shooter's crouch."

**5.** Whether the district court abused its discretion in finding the State laid a proper foundation to support admitting the testimony of Grant Fredericks, a video expert, regarding the precise moment Flores was shot.

### III. STANDARD OF REVIEW

This "Court reviews a trial court's decision admitting or excluding evidence, including the testimony of expert witnesses, under the abuse of discretion standard." *White v. Mock*, 140 Idaho 882, 888, 104 P.3d 356, 362 (2004). "A trial court does not abuse its discretion if it (1) recognizes the issue as one of discretion, (2) acts within the boundaries of its discretion and applies the applicable legal standards, and (3) reaches the decision through an exercise of reason." *Fazzio v. Mason*, 150 Idaho 591, 594, 249 P.3d 390, 393 (2011).

### IV. ANALYSIS

**A. The District Court Did Not Abuse Its Discretion in Admitting Evidence About the Criminality of Gangs**

Almaraz argues that the district court erred by admitting evidence regarding the criminal conduct of BMC members and of street gangs in general as impermissible character evidence. The State first argues that Almaraz did not preserve this issue for appeal because he only objected generally to the admission of evidence relating to his membership in a criminal gang, not to the evidence of other BMC members' acts or general gang activity. The State then argues that the district court correctly admitted the testimony of Salazar, Landin, and Officer Cantrell to show motive.

Almaraz sufficiently objected to both the introduction of Officer Cantrell's testimony and that of Salazar and Landin to preserve these issues for appeal. Generally, this Court will not consider issues on appeal that were not raised below. *State v. Danney*, 153 Idaho 405, ___, 283 P.3d 722, 725 (2012). Both parties addressed the issue of admitting evidence of BMC's criminal conduct at the pre-trial hearing on the State's motion in limine. The State presented the testimony regarding the criminal activity of BMC under the guise of I.R.E. 404(b) and argued that the evidence was relevant to Almaraz's motive. The defense objected to this testimony as unfairly prejudicial because of a fear that prior bad acts or wrongs associated with gang activity would be used for propensity purposes, which would substantially outweigh any probative value.

5

The defense objected to Officer Cantrell's expert testimony at trial on I.R.E. 404(b) grounds. The Court heard argument from both parties on this issue outside the presence of the jury. It is clear from the defense's argument that the objection to Officer Cantrell's testimony about gang life was made out of a concern that the evidence would in fact be used for propensity purposes. The defense also argued that this evidence was not even relevant, because none of these general gang activities were tied to Almaraz. Therefore, Almaraz sufficiently objected to the State's evidence of other BMC members' acts and of general gang activity as unfairly prejudicial character evidence to preserve these issues for appellate review.

Generally, character evidence is not permissible to prove a person acted in conformity therewith. I.R.E. 404(a). Furthermore, evidence of other crimes, wrongs, or acts is also not admissible to prove criminal propensity. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009); *see* I.R.E. 404(b). However, evidence of other crimes, wrongs, or prior acts may be admissible if offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." I.R.E. 404(b). The admissibility of prior bad acts is subject to a two-pronged analysis. *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007). First, the court must determine whether the prior wrong or bad act is relevant to a material issue other than the defendant's character or propensity to commit the crime charged. *Id.* Second, the court must perform a balancing test to determine whether the probative value of the bad act is substantially outweighed by the danger of unfair prejudice. *Id.*; *see also* I.R.E. 403. The trial court's determination regarding the danger of unfair prejudice is discretionary and will not be disturbed on appeal unless it is shown to be an abuse of discretion. *Id.*; *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991).

1. *Both the criminal conduct of BMC and the criminal conduct of gangs generally are relevant to proving motive.*

The district court properly used its discretion to admit the testimony of Salazar and Landin to support the State's theory that Almaraz was motivated to kill Flores because of a gang rivalry. On appeal, it is undisputed that evidence of Almaraz's membership in the BMC gang was properly admitted under I.R.E. 404(b) to demonstrate motive. This Court further holds that the testimony from Salazar and Landin regarding the criminal and violent conduct of BMC members was also properly admitted. Such evidence is relevant to explain how gang rivalries can often lead to violence and retaliation. Salazar and Landin provided specific examples of prior crimes that BMC members had committed. The defense argues that such evidence of prior

bad acts is improper character evidence under I.R.E. 404(b) because the testimony is about other members' bad acts and is not specifically related to Almaraz. The fact that the conduct was not related to Almaraz shows it was not offered to prove his character but only to prove motive. This testimony is relevant under I.R.E. 401 and I.R.E. 402 because it illustrates how something as simple as wearing a red shirt could trigger a rival gang member to react with violence if he felt disrespected. We hold that this evidence is relevant to an issue other than Almaraz's criminal propensity for murder; it is relevant to illustrate motive and intent.

The district court also correctly admitted the testimony of Officer Cantrell, the State's expert on gang activity. Officer Cantrell testified that different gangs wear different colors and that a rival gang wearing a rival color may incite violence. Because none of Officer Cantrell's testimony was specific to BMC, Almaraz argues that the testimony was irrelevant and highly prejudicial character evidence under I.R.E. 404(a). Almaraz argues that by allowing Officer Cantrell to testify that gangs generally commit crimes, the jury would infer that Almaraz was more likely to commit crimes because he is a gang member. Officer Cantrell's testimony is relevant to motive because it explains how criminal gangs operate and assists the jury in understanding the nature of gang rivalries. Thus, we hold that Officer Cantrell's testimony about gang culture was relevant to a material issue other than Almaraz's propensity to commit crime.

> 2. *The probative value of the evidence relating to the gang activity of BMC and the criminal conduct of street gangs in general was not substantially outweighed by unfair prejudice.*

The district court recognized the potentially inflammatory nature of gang evidence and balanced the probative value of the testimony against the danger of unfair prejudice in accordance with I.R.E. 403. The court found that the probative value of the testimony was not substantially outweighed by the prejudicial effect of the testimony. To further mitigate any unfair prejudice of gang related testimony, the district court gave a limiting instruction to prevent the jury from considering the evidence as probative of Almaraz's propensity to commit crimes. The district court instructed the jury that "[s]uch evidence may be considered by you only for the limited purpose of proving the defendant's motive. . . . You should disregard such evidence if you find no connection between the crime charged and gang involvement."[1] The testimony challenged is relevant in understanding Almaraz's purported motive to shoot Flores because of a

---

[1] In addition to giving jury instructions at the close of the trial, the court also gave the jury a limiting instruction regarding all expert testimony presented, explaining that the experts are there to assist the jurors in weighing the information, but ultimately the determination is up to the jurors as the triers of fact.

7

seemingly harmless offense—wearing a red jersey in the wrong place. Such evidence of gang culture was necessary to explain how the mere gesture of refusing to remove a shirt could amount to an act of disrespect that provoked a violent and deadly reaction. Therefore, this Court finds that the district court did not abuse its discretion in determining that the probative value of the evidence relating to BMC's criminal activity and the violent nature of street gangs was not substantially outweighed by unfair prejudice.

**B.    The District Court Erred in Failing to Suppress Ken Hust's Identification of Almaraz as the Shooter**

Hust was a patron at the Club 7 bar on the night of the shooting and he identified Almaraz as the shooter at trial. The defense filed a pretrial motion to suppress Hust's identification arguing that both the interview procedures and group photograph used by the police were overly suggestive, rendering the identification unreliable. The district court denied the motion to suppress, ruling that the identification procedure was not so overly suggestive that it diminished reliability. On appeal, Almaraz contends that the overly suggestive procedures used by the police to obtain Hust's identification violated his due process rights. The State argues that in order for a constitutional violation to occur, the suggestive procedures must be based on police action and the suggestive nature of the group photograph was not created by police action. If showing the suggestive photograph to Hust was state action, the State then argues that the police interview was not suggestive because Officer Sloan was not trying to change Hust's identification, but elicit information that Hust was withholding due to fear of retaliation.

The preliminary issue for this Court is whether Office Sloan's act of showing Hust the group photograph was police action. While this Court acknowledges that the suggestive nature inherent in the photograph was not created by police action, the act of showing the suggestive photograph instead of a proper photo lineup was clearly police action. Therefore, this Court must address the substantive issue of whether the district court erred in denying the defense's motion to suppress Hust's identification.

In reviewing the district court's ruling on a motion to suppress, this Court applies a bifurcated standard of review. *State v. Ray*, 153 Idaho 564, 286 P.3d 1114, 1117 (2012). This Court will accept the trial court's findings of fact that are supported by substantial evidence and freely review any constitutional principles implicated by the facts. *Id.* To determine whether evidence of an out-of-court identification violates due process, this Court applies a two-step test.

*See State v. Hoisington,* 104 Idaho 153, 162, 657 P.2d 17, 26 (1983). First, the defendant must establish that the identification procedure was overly suggestive. *United States v. Wade,* 388 U.S. 218, 240 n.1 (1967); *Hoisington,* 104 Idaho at 162, 657 P.2d at 26. Second, if the defendant meets that burden, courts consider whether the identification was nonetheless reliable under the totality of the circumstances. *Id.* This second step entails considering the witness's opportunity to view the perpetrator, his degree of attention, the accuracy of his description, his level of certainty, and the time between the crime and pretrial confrontation, and then weighing those factors against the "corrupting effect of the suggestive identification." *Manson v. Brathwaite,* 432 U.S. 98, 108 (1977); *Hoisington,* 104 Idaho at 162, 657 P.2d at 26. Thus, greater indicia of reliability may be necessary the more egregious the suggestive procedures.

This Court is aware of the dangers of erroneous eyewitness identification. As Justice William J. Brennan said, "there is almost nothing more convincing [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders,* 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (internal quotation marks omitted)). Indeed, the empirical evidence demonstrates that eyewitness misidentification is "the single greatest cause of wrongful convictions in this country." *State v. Henderson,* 27 A.3d 872, 885 (N.J. 2011). While this Court has acknowledged that the reliability of eyewitness identification has been subject to "ongoing scientific and judicial inquiry," we have yet to articulate the impact of this inquiry on our due process analysis. *See State v. Crawford*, 99 Idaho 87, 102, 577 P.2d 1135, 1150 (1978).[2] The New Jersey Supreme Court recently undertook a very thorough examination of the current state of scientific research regarding eyewitness identifications and concluded that "[t]he research . . . is not only extensive," but "it represents the 'gold standard in terms of the applicability of social science research to the law.'" *Henderson,* 27 A.3d at 916. "Experimental methods and findings have been tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings." *Id.* We agree with the New Jersey Supreme Court and find that this extensive research convincingly demonstrates the fallibility of eyewitness

---

[2] The highest courts of two states have recently called into question the *Manson* test, based on the last 35 years of social science research into the reliability of eyewitness identifications. *See Henderson,* 27 A.3d 872; *Oregon v. Lawson,* 291 P.3d 673 (Or. 2012). In both instances, the courts provided defendants greater protections than *Manson* prescribes.

identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification.

The New Jersey Supreme Court divided these variables into "system variables" and "estimator variables." System variables are factors that are "within the control of the criminal justice system." *Id.* at 895. Estimator variables are "factors related to the witness, the perpetrator, or the event itself—like distance, lighting, or stress—over which the legal system has no control." *Id.*

The research showed that the following system variables help reduce the risk of misidentification: (1) conducting the identification procedure double-blind helps ensure that lineup administrators who know the suspect's identity do not inadvertently suggest the information to the witness;[3] (2) administering proper pre-lineup instructions that inform the witness that a suspect may or may not be in the lineup and it is permissible not to identify anyone; (3) avoiding confirmatory or post-identification feedback which can engender a false sense of confidence in the witness's identification;[4] (4) making a full record of the witness's statement of confidence once an identification is made; and (5) shielding witnesses from viewing suspects or fillers more than once.[5] *Id.* at 895–903.

In contrast, the research established that the following estimator variables diminish the reliability of a witness's identification: (1) stress; (2) the use of a visible weapon during a crime;[6] (3) the shorter the duration of a criminal event; (4) the greater the distance and the poorer the

---

[3] "Even seemingly innocuous words and subtle cues—pauses, gestures, hesitations, or smiles—can influence a witness' behavior." *Henderson*, 27 A.3d at 896 (citing Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator– Witness Contact on Eyewitness Identification Accuracy,* 89 *J. Applied Psychol.* 1106, 1107 (2004); Steven E. Clark et al., *Lineup Administrator Influences on Eyewitness Identification Decisions,* 15 *J. Experimental Psychol.: Applied* 63, 66–73 (2009)).

[4] There is substantial research about confirmatory feedback, which shows that witnesses who received feedback confirming their identification express significantly more confidence in their identification and report "better witnessing conditions at the time of the crime, stronger memory at the time of the lineup, and sharper memory abilities in general." *Henderson*, 27 A.3d at 899 (quoting Amy Bradfield Douglass & Nancy Steblay, *Memory Distortion in Eyewitnesses: A Meta–Analysis of the Post-identification Feedback Effect,* 20 *Applied Cognitive Psychol.* 859, 863 (2006)).

[5] A meta-analysis of multiple studies revealed that although 15% of witnesses mistakenly identified an innocent person viewed in a lineup for the first time, that percentage increased to 37% if the witness had seen the innocent person in a prior mugshot. *Henderson*, 27 A.3d at 900 (citing Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference,* 30 *Law & Hum. Behav.* 287, 299 (2006)).

[6] "Weapon focus can also affect a witness' ability to describe a perpetrator. A meta-analysis of ten studies showed that 'weapon-absent condition[s] generated significantly more accurate descriptions of the perpetrator than did the weapon-present condition.'" *Henderson*, 27 A.3d at 905 (quoting Nancy M. Steblay, *A Meta–Analytic Review of the Weapon Focus Effect,* 16 *Law & Hum. Behav.* 413, 415–17 (1992)).

lighting conditions; (5) increased levels of intoxication; (6) the use of disguises during the crime and changes in facial features between the time of initial observation and a subsequent identification; (7) the greater the period of time between observation and identification to law enforcement;[7] (8) race-bias;[8] and (9) feedback from co-witnesses confirming the identification of a perpetrator. *Id.* at 904–09.

These two types of variables dovetail nicely with the two-step analysis this Court applies to determine whether evidence of an out-of-court identification violates due process. As previously stated we first look at whether the identification procedures are overly suggestive, and if we find that they are, we examine whether the reliability of the identification outweighs the corrupting effect of the suggestive identification. We hold that the system variables outlined above are factors that courts should consider in determining whether identification procedures were overly suggestive.

Correspondingly, the estimator variables we addressed serve to elaborate on this Court's five-factor test for reliability: (1) the witness's opportunity to view the perpetrator, (2) the witness's degree of attention, (3) the witness's accuracy of description, (4) the witness's level of certainty, and (5) the time between the crime and pretrial confrontation. For example, under the first factor courts may consider the lighting at the time the crime was committed, whether the perpetrator was wearing a disguise, and the length of time taken to commit the crime, among other variables. Under the second factor courts may consider the amount of stress the witness was under, whether a weapon was present, or the witness's level of intoxication. Additionally, we note that courts should be cautious in the amount of weight they give to a witness's degree of certainty in their identification when police have used overly suggestive procedures, particularly when confirmation feedback has been given. *See State v. Lawson*, 291 P.3d 673, 689 (Or. 2012) (noting that "the current scientific knowledge and understanding regarding the effects of

---

[7] A meta-analysis of 53 "facial memory studies" established "that memory strength will be weaker at longer retention than at briefer ones." Kenneth A. Deffenbacher et al., *Forgetting the Once–Seen Face: Estimating the Strength of an Eyewitness's Memory Representation,* 14 *J. Experimental Psychol.: Applied* 139, 142 (2008). However, researchers have not been able to pinpoint the threshold for when a person's recall becomes unreliable. *Henderson*, 27 A.3d at 907.

[8] Studies have shown that a witness may have more difficulty making an identification when the suspect is of a different race than the witness. *Henderson*, 27 A.3d at 907 (citing Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own–Race Bias in Memory for Faces: A Meta–Analytic Review,* 7 *Psychol. Pub. Pol'y & Law* 3, 21 (2001)).

suggestive identification procedures indicates that self-reported evidence [a witness's level of certainty and degree of attention] can be inflated by the suggestive procedure itself").

In sum, we are not changing the two-part test this Court adopted in *Hoisington* to determine whether an out-of-court-identification violates a defendant's due process rights. Rather, by outlining the system and estimator variables that research has convincingly shown to impact the reliability of eye-witness identification, we hope to provide guidance to lower courts applying the test from *Hoisington*.

> 1. *The procedures used in obtaining Hust's pretrial identification were overly suggestive.*

This Court must first determine whether the State's conduct was impermissibly suggestive. "[T]he due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification." *Hoisington*, 104 Idaho at 161, 657 P.2d at 25. In accordance with the framework we have just laid out, our analysis of whether the procedures Officer Sloan used during Hust's identification were overly suggestive will include consideration of whether any of the system variables that diminish the chance of misidentification, such as double-blind administration or proper pre-identification instructions, were present.

It is clear from the facts the police violated the standard guidelines for preparing a photo lineup by choosing a picture that was overly suggestive in nature. When asked about the proper procedures used to prepare a photo lineup, Officer Sloan testified that he typically asks the department's secretary for a lineup after giving her the suspect's name. The DMV then provides the photos using other individuals with similar race, weight, and height, within a couple of hours from the request. Far from a double-blind administration of a line-up, Officer Sloan was involved in the case and used a single photograph that pictured Almaraz in the center of a group of individuals. Officer Sloan provided no explanation or justification for using the group photograph as the photo lineup for Hust's identification.[9] Furthermore, the police had time— three days—and the ability to arrange a traditional photo lineup.

---

[9] The defense asked "[c]an you explain why you wouldn't have used a photo lineup for that rather than a group picture that you obtained?" Officer Sloan answered "I can't explain that at this time. I mean, the picture was there, and I just showed it to Mr. Hust and went from there."

Additionally, Officer Sloan's conduct during the identification was also suggestive. Officer Sloan repeatedly interrupted the witness, asked leading questions which implied the answer he was looking for, and discussed with Hust outside information about the case, the suspect, and the victim during the interview. Even more troubling is the fact that Officer Sloan turned off the tape recorder right before he asked Hust to identify Almaraz from the group photograph. Such conduct by a police officer is an egregious error that deprives the court of having a full record of the witness's confidence in his identification.

Further, Officer Sloan failed to give Hust the general instruction that the suspect may or may not be in the photo. Not only did Officer Sloan fail to give any pre-identification instructions, he indicated that Almaraz was in the photograph when he asked, "who had the gun?" Officer Sloan's question was manifestly suggestive. In telling Hust that the shooter was already in custody, and that they had a strong case, Officer Sloan implied that the shooter would be present in any photographic lineup offered for identification.[10] Finally, rather than using a traditional photo lineup, Hust was shown a group photograph which placed Almaraz squarely in the center of the group with a chandelier hanging directly over his head. If a photo lineup creates a situation in which the witness's attention is focused on the defendant, the lineup may be unduly suggestive. *State v. Hyde*, 127 Idaho 140, 146, 898 P.2d 71, 77 (Ct. App. 1995) (citing *State v. Haggard*, 119 Idaho 664, 667, 809 P.2d 525, 528 (Ct. App. 1991)). Moreover, Almaraz was the only individual without facial hair in the photograph.

The district court analyzed the suggestiveness of the police interview during the motion to suppress hearing. As to the photograph, the district court stated that the issue of suggestiveness "is one for the jury to make a determination." As to the interview, the district court had concerns after reading the written transcript but "[w]hen I listened to Officer Sloan's testimony, suddenly there was context to that transcript. Well, [Hust] was reluctant, he was scared." Going further, the district court concluded that Officer Sloan was dealing with a scared witness and was abrupt in an effort to get Hust to talk, rather than an effort to guide his answers.

---

[10] Two meta-analyses found that telling witnesses in advance that the suspect may not be present in the lineup, and that they need not make a choice, led to more reliable identifications in target-absent lineups. *See* Nancy Mehrkens Steblay, *Social Influence in Eyewitness Recall: A Meta–Analytic Review of Lineup Instruction Effects,* 21 *Law & Hum. Behav.* 283, 285–86, 294 (1997); Steven E. Clark, *A Re-examination of the Effects of Biased Lineup Instructions in Eyewitness Identification,* 29 *Law & Hum. Behav.* 395, 418–20 (2005). By contrast, in one experiment, 45% more people chose innocent fillers in target-absent lineups when administrators failed to warn that the suspect may not be there. *See* Roy S. Malpass & Patricia G. Devine, *Eyewitness Identification: Lineup Instructions and the Absence of the Offender,* 66 *J. Applied Psychol.* 482, 485 (1981).

We do not dispute the district court's finding of fact that Officer Sloan's questioning of Hust was not overly suggestive on its own. However, when Officer Sloan's questioning is coupled with the suggestive group photograph, his failure to give proper pre-identification instructions, and his failure to record Hust's identification, the same conclusion cannot be reached. Taken together, we hold that the procedures Officer Sloan employed to elicit Hust's identification were overly suggestive.

2. *The overly suggestive interview and photographic lineup were not outweighed by aspects of reliability.*

Once the police procedures are found to be overly suggestive, the court must conduct a second inquiry to determine "whether under 'the totality of the circumstances' the identification was reliable even though the [identification] procedure was suggestive." *Hoisington,* 104 Idaho at 162, 657 P.2d at 26 (quoting *Biggers*, 409 U.S. at 199). We continue to apply the five-factor test found in *Hoisington*, but also consider the relevant estimator variables that fall under these factors. A court must consider the following five factors to decide whether the identification is sufficiently reliable: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the identification, and (5) the length of time between the crime and the identification. *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Biggers*, 409 U.S. at 199).

Under the first factor, Hust's proximity to and involvement in the fight provided an opportunity to view the shooter at the time of the shooting. Not only was Hust at the bar on the night of the murder, he also testified that he was trying to break up the fight and indicated that he was merely two to three feet away from Almaraz. However, Hust also stated that he did not get a good look at the shooter's face because he was focused on the victim and because the shooter ducked down and ran out of the bar so quickly. Additionally, in *Henderson*, the New Jersey Supreme Court cited research indicating that "while there is no minimum time required to make an accurate identification, a brief or fleeting contact is less likely to produce an accurate identification than a more prolonged exposure." 27 A.3d at 905.

Under the second factor, there is substantial evidence that Hust's attention was compromised due to his intoxication and the chaotic atmosphere of the bar after the fight

14

erupted.  Hust testified that he had been drinking heavily the night of the incident.[11] Studies have found that "the effects of alcohol on identification accuracy show that high levels of alcohol promote false identifications" and that "low alcohol intake produces fewer misidentifications than high alcohol intake." *Id.* at 906 (citing Jennifer E. Dysart et al., *The Intoxicated Witness: Effects of Alcohol on Identification Accuracy from Showups,* 87 *J. Applied Psychol.* 170, 174 (2002)). The district court noted that Hust attempted to break up the fight and viewed Almaraz as a participant in the fight.  However, Hust's impairment and the chaotic nature of the bar fight would impact his level of awareness and weighs against reliability.

In analyzing the third factor, Hust's description of the shooter became more detailed over the course of the interview, but was not entirely inaccurate.  Hust described the shooter as a Hispanic male of average weight and height, but he initially told Officer Sloan that he did not get a look at the shooter's face. He also provided an incorrect description of what the shooter was wearing and could not remember if the shooter was wearing a hat.  Eventually, Hust stated that "if I seen [sic] his face I could probably say it was him or it wasn't him" and that he saw the shooter's face "as he turned back around and he ducked down" while exiting the bar.  In its analysis, the district court found that the clothing description was inaccurate, but not fatal to the later identification.

Under the fourth factor, this Court finds that the level of certainty Hust demonstrated during the identification weighs against reliability because Officer Sloan turned off the tape recorder before showing Hust the photographic lineup.  It is an improper police tactic for an interviewing officer to record only part of the interview, especially without providing a reason or justification.  This action denies all reviewing courts of the best recollection of what was said or done and thereby may weaken the state's preparation for further investigation or courts' preparation for reviewing the identification. Because Hust did not testify in the pretrial proceedings, this Court must rely solely on Officer Sloan's testimony that Hust had an immediate reaction when he saw the photograph and identified Almaraz without hesitation. Officer Sloan described Hust's reaction to the photograph as though he had "seen a ghost" and recognized Almaraz as the shooter "without hesitation." The district court found that the "level of certainty demonstrated at the identification, while the officer testified that he acted like he saw a ghost or whatever, he had responded immediately and was quite certain." However, since the

---

[11] Hust recalled drinking approximately six to eight beers and two shots of liquor prior to the shooting.

15

tape recorder was turned off before Hust's identification, and Hust did not testify at trial that any of Officer Sloan's actions led him away or toward identifying the defendant, we only have the officer's testimony as evidence to the level of certainty demonstrated. These facts together with the potential for confirmation feedback weigh against reliability.

Finally, in analyzing the fifth factor, the length of time between the shooting and the identification was reasonable and did not detract from the overall reliability of the identification. Three days elapsed between the shooting and Hust's identification and courts have found this time period to be acceptable.[12] *See e.g.*, *State v. Gray*, 129 Idaho 784, 797, 932 P.2d 907, 920 (Ct. App. 1997).

Of the five factors, only the fifth factor is unquestionably in favor of reliability. The other four factors each have specific shortcomings that call into question the reliability of the identification. Additionally, as we noted above, confirmation feedback from overly suggestive police procedures can impact an eyewitness's level of certainty in their identification. This is especially troublesome given the unexplained turning off the tape recorder before the interview was complete. After balancing these five reliability factors against the suggestive elements of the identification, the reliability of the identification fails to outweigh the impact of the suggestive circumstances. Therefore, this Court holds that the district court erred in admitting Hust's identification because the suggestiveness of the identification procedure was not outweighed by independent indicia of reliability.

> 3. *Whether the State met its burden of proving that the district court's erroneous admission of Hust's identification of Almaraz into evidence was harmless.*

Where a defendant alleges error at trial that he contemporaneously objected to, this Court reviews the error on appeal under the harmless error test. *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010). If the Court finds that the district court abused its discretion in admitting or excluding the evidence, then the Court must declare a belief beyond a reasonable doubt that the error did not affect the outcome of the trial, in order to find that the error was harmless and not reversible. *Id.* at 227–28, 245 P.2d at 979–80. In other words, the error is harmless if the Court finds that the result would be the same without the error. *See id.* In *Perry*, this Court applied the standard of harmless error for a constitutional violation found in the United States Supreme Court opinion in *Chapman v. California*, 386 U.S. 18 (1967). "Under the

---

[12] Additionally, the three days that elapsed between the shooting and Hust's identification provided the investigators with ample time to construct a proper line-up.

*Chapman* harmless error analysis, where a constitutional violation occurs at trial, and is followed by a contemporaneous objection, a reversal is necessitated, *unless* the State proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Perry*, 150 Idaho at 221, 245 P.3d at 973 (quoting *Chapman*, 386 U.S. at 21). Put another way, did the State prove beyond a reasonable doubt that the verdict would have been the same if Hust's testimony had not been erroneously admitted into evidence.

In this case, the State argued in oral argument that any evidentiary errors are harmless. The critical analysis, then, is whether the State properly advanced an argument that any error in the introduction of Hust's testimony—and that of Officer Sloan relating to his identification—was harmless.

In the context of the exclusion of Dr. Reisberg's testimony, the State's brief argues that the Hust's identification is not a key element of the prosecution's case.

> The evidence in this case established that Almaraz was engaged in a fight with the victim when the victim was shot and all the evidence, including surveillance video of the moments just before and just after the shot was fired, indicates that Almaraz was the killer. Although Hust's identification was helpful, it was not so important as to be considered key.

Going further, the State argues the existence of other evidence that does not rely upon Hust's testimony. This evidence includes the murder weapon that was found near the crime scene in a shirt tied to Almaraz and ammunition identical to that used in the killing being found at Almaraz's residence.

However, the State never specifically argues that Hust's identification did not "contribute to the verdict obtained" as clearly required under *Perry*. For example, the subject is not even discussed in the State's written brief on appeal, and is only vaguely referenced at oral argument. This Court has previously held that "[a]dditional issues raised for the first time on appeal at oral argument are not properly before this Court." *State v. Crowe*, 131 Idaho 109, 111, 952 P.2d 1245, 1247 (1998). As such, the State has failed to meet its burden of proving beyond a reasonable doubt that the verdict in this case would have been the same even if Hust's testimony had not been admitted. Therefore, this Court finds that the State failed to meet its burden of proving that the error is harmless.

**C.    The District Court Abused Its Discretion by Limiting the Expert Testimony of Dr. Reisberg**

On appeal, Almaraz argues that the district court abused its discretion by limiting Dr. Reisberg's testimony and precluding him from testifying specifically to the procedures associated with Hust's identification. In response, the State argues that Almaraz failed to show error in the district court's ruling on the scope of admissible testimony on the reliability of eyewitness identification.

Dr. Reisberg testified twice in this case. He first took the stand in a pre-trial hearing on the State's motion in limine to exclude or limit expert testimony on eyewitness identification. The defense called Dr. Reisberg, a cognitive psychologist, to offer expert testimony on the suggestiveness of Officer Sloan's interview with Hust and the photographic lineup. Dr. Reisberg offered testimony on how eyewitness memory can be affected by many factors, including suggestiveness during police questioning. After testimony and argument, the district court ruled that the defense would be allowed to present testimony from Dr. Reisberg, although the extent of his testimony would be determined during trial outside of the presence of the jury.

During trial, the defense again offered Dr. Reisberg's expert testimony on the suggestiveness of Officer Sloan's interview with Hust and the photographic lineup. Specifically, the defense wanted to play audio portions of Hust's actual interview and then allow Dr. Reisberg to point out how the interview violated established guidelines. The district court allowed Dr. Reisberg to testify about the suggestiveness of the photographic lineup, but ruled that his expert opinion regarding the suggestiveness of the interview would invade the province of the jury. The district court found it proper to leave the accuracy of Hust's identification to the jury and precluded Dr. Reisberg from making any direct connections between improper technique and the procedures Officer Sloan employed during his interview with Hust. The district court only allowed the defense to present expert testimony from Dr. Reisberg regarding suggestive procedures that can render eyewitness identification unreliable. In his testimony before the jury, Dr. Reisberg identified proper guidelines regarding witness interviews and identified specific types of police conduct that could compromise a witness's memory. Almaraz argues that the district court abused its discretion because Dr. Reisberg's expert opinion testimony regarding the suggestiveness of the Hust interview would have assisted the jury in understanding how to apply the guidelines to the facts and in determining the proper weight to give Hust's identification.

1.   *The District Court Erred by Prohibiting Dr. Reisberg from Testifying to the Specific Procedures Associated with Hust's Identification.*

18

Under I.R.E. 702, an expert witness may provide an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Therefore, after the court qualifies a witness as an expert, it "must determine whether such expert opinion testimony will assist the trier of fact in understanding the evidence." *State v. Pearce*, 146 Idaho 241, 246, 192 P.3d 1065, 1070 (2008). Expert testimony that only vouches for the credibility of another witness "encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *State v. Perry*, 139 Idaho 520, 525, 81 P.3d 1230, 1235 (2003). However, expert opinion testimony that is admissible under I.R.E. 702 "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." I.R.E. 704. Indeed, we have routinely held that "an expert's opinion, in a proper case, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. To venture beyond that point, however, is to usurp the jury's function." *Perry*, 139 Idaho at 525, 81 P.3d at 1235 (quoting *State v. Hester,* 114 Idaho 688, 696, 760 P.2d 27, 35 (1988)).

The trial court has discretion in excluding expert testimony on eyewitness identification and will not be overturned without an abuse of discretion. *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007). A lower court does not abuse its discretion if the court correctly recognized the issue as one of discretion, acted within the bounds of its discretion, and reached its decision by exercising reason. *State v. Moore*, 131 Idaho 814, 819, 965 P.2d 174, 179 (1998) (citing *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991)).

Here, the district court abused its discretion when it ruled that Dr. Reisberg could not testify about the specific procedures used in Hust's interview. In making its ruling, the court excluded the testimony as invading the province of the jury without making a determination as to whether it would have assisted the jury. The district court was correct that expert opinion testimony as to the accuracy of Hust's identification would invade the province of the jury, but Dr. Reisberg's testimony was not an opinion as to Hust's credibility. Rather, Dr. Reisberg would have testified about the specific instances of police suggestiveness, which would have been helpful to the average juror's understanding of whether the interview was conducted in an overly suggestive way. Courts should not overly restrict expert testimony that assists the jury.

19

In reaching this holding, this Court still recognizes that an expert cannot opine to the accuracy of the eyewitness identification or the credibility of any witness as those matters are reserved for the jury. However, an expert witness may testify to specific instances of police suggestiveness that may call into question the reliability of the eyewitness testimony.

> [E]xpert testimony on the reliability of eyewitness identifications does not invade the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony. An expert should not be permitted to give an opinion about the credibility or accuracy of the eyewitness testimony itself; that determination is solely within the province of the jury. Rather, the expert should be permitted to testify only about factors that generally have an adverse effect on the reliability of eyewitness identifications and are relevant to the specific eyewitness identification at issue.

*State v. Guilbert*, 49 A.3d 705, 729 (Conn. 2012) (internal citations and quotations omitted). Testimony relating to the proper guidelines for conducting an accurate interview or lineup, whether or not those procedures were followed in the case at hand, and the consequences of non-compliance with those procedures does not invade the province of the jury. The disallowed testimony offered by Dr. Reisberg was aimed at specific procedures employed by Officer Sloan, and how empirical research has shown those procedures to be suggestive. Dr. Reisberg was not offering an opinion on the credibility or accuracy of the eyewitness testimony itself. Credibility is an issue for the jury, as the jury is the lie detector in the courtroom. *See Perry*, 139 Idaho at 525, 81 P.3d at 1235. The district court erred by excluding Dr. Reisberg's testimony on the ground that it would invade the province of the jury, when the testimony was not an opinion on Hust's credibility. Therefore, this Court holds that the district court erred in limiting Dr. Reisberg from testifying about the specific instances of suggestive conduct used during Officer Sloan's interview with Hust.

2. *The State failed to meet its burden to show that the limitation on Dr. Reisberg's testimony was harmless error.*

Where a defendant alleges error at trial that he contemporaneously objected to, this Court reviews the error on appeal under the harmless error test. *Perry*, 150 Idaho at 222, 245 P.3d at 974. "A defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *Id.*

For reasons similar to Section IV.B above, the State failed to meet its burden. There is no mention of harmless error in the State's briefing on appeal, and only a general mention of

20

harmless error at oral argument offered without supporting authority. This Court has previously held that "[a]dditional issues raised for the first time on appeal at oral argument are not properly before this Court." *Crowe*, 131 Idaho at 111, 952 P.2d at 1247. This Court has acknowledged that this rule will be relaxed when the issues are supported by argument in the briefs, *id.*, but there is no direct argument on this point in the State's brief. Therefore, we hold that the State failed to meet its burden of demonstrating that the error is harmless beyond a reasonable doubt.

**D.    The District Court Did Not Abuse Its Discretion by Allowing Lieutenant Steele to Testify that Almaraz Was in a "Shooter's Crouch" Just Before the Victim Was Shot**

Lieutenant Stephanie Steele was called to duty on the night of the shooting and supervised the investigation. The State called Lieutenant Steele to testify about the investigation and to review the bar's surveillance video tapes. On re-direct examination, the State asked her to describe the information she was relaying at the scene to the other officers and what part of the surveillance video was significant to the investigation. Lieutenant Steele identified a key frame in the video at 2:19:50 where she testified that Almaraz "appears to be in a – what I call a shooter's crouch" just before Flores was shot. The defense argued that such an interpretation invaded the province of the jury and was beyond the scope of cross-examination. The district court ultimately allowed Lieutenant Steele to proceed, reasoning that the testimony was relevant to illustrate what details she was relying on when she relayed the information to the other officers. Nevertheless, the court agreed that the issue was ultimately up to the jury and provided a limiting instruction explaining that the jurors should make their own determination of what the videos showed. Lieutenant Steele continued to testify about her interpretations of the video and identified the suspect's position immediately after Flores was shot and described how he exited the bar. The defense objected on the grounds that it was improper opinion testimony and the court sustained the objection until foundation was provided.

Later in the trial, the defense called Officer Dean Muchow who also viewed the bar's surveillance videos. When asked on direct examination if there was a question about when exactly the shot occurred, the State objected that such testimony was improper opinion evidence because of a lack of foundation or knowledge. After sustaining the objection, the defense responded by reminding the court "[w]ell judge, over objection you allowed Lieutenant Steele, with absolutely no more foundation, to give her opinion about not only exactly when the shot occurred, but where the shooter was, the shooter's stance. And that's in the record now. And it was over objection." The district court responded by acknowledging that Lieutenant Steele's

21

testimony may have been improperly admitted. The court stated "[a]nd I have noted to counsel since then that that was – I didn't say it on record, but that wasn't something that should have been allowed, but it was something in context to something else."

*1. Almaraz's Claims Were Properly Preserved for Appellate Review.*

On appeal, the defense argues that the description of Almaraz in a shooter's crouch improperly invaded the province of the jury because it answered the ultimate issue in the case – who shot Gabriel Flores? The defense further contends that Lieutenant Steele's testimony was improper lay opinion testimony under I.R.E. 701 because it was based on specialized knowledge and a proper foundation had not been laid for her to testify as an expert. The State argues that Almaraz did not properly preserve the issue for appellate review because the defense made no reference to I.R.E. 701 as grounds for the objection at trial.

> Generally, this Court will not consider an alleged error on appeal unless a timely objection to the alleged error was made at trial. For an objection to be preserved for appellate review, either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context.

*State v. Sheahan*, 139 Idaho 267, 277, 77 P.3d 956, 966 (2003) (internal citations omitted).

However, some discretion lies with the court to consider the objection in light of the context in which it was presented. Under I.R.E. 103(a), an objection must state "the specific ground of objection, if the specific ground was not apparent from the context." After reviewing the objection within the context of the arguments contained in the transcripts, this Court finds that the issue was properly preserved for appeal. After Lieutenant Steele characterized Almaraz's stance as "what I call a shooter's crouch," the defense objected by stating: "everybody can look at the same video with the same eyes. And ultimately, it's the jury's question. And interpretation's out of line." Moreover, as Lieutenant Steele continued to describe her interpretations of the video, she testified that the man in the shooter's crouch moved after Flores was shot and pointed out his new position on the video. The defense objected stating "that is an opinion and reasonable people watching this, I guarantee you, will disagree with that interpretation." Although the rule was not specifically invoked, the defense's arguments surrounding Lieutenant Steele's testimony show that the defense was concerned that her conclusion was a lay opinion that was not helpful to a clear understanding for the jury and was based on specialized knowledge as a police officer in violation of I.R.E. 701.

*2. The District Court Did Not Abuse Its Discretion by Allowing Lieutenant Steele to Testify that Almaraz Was in What She Called a "Shooter's Crouch."*

The decision to admit opinion testimony, whether lay opinion or expert opinion, rests within the discretion of the lower court, while the determination of its weight lies with the jury. *State v. Cutler*, 94 Idaho 295, 299, 486 P.2d 1008, 1013 (1971). "The trial court's broad discretion in admitting evidence 'will only be disturbed on appeal when there has been a clear abuse of discretion.'" *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998) (quoting *Walker v. Am. Cyanamid Co.,* 130 Idaho 824, 832, 948 P.2d 1123, 1131 (1997)).

While this Court acknowledges that the admissibility of Lieutenant Steele's statement that Almaraz was in what she calls a "shooter's crouch" may have been a close call, this Court finds that the decision was made within the district court's discretion. Lieutenant Steele testified to her personal observations of the video and simply explained why she thought frame 2:19:50 was a key frame and why the gentleman in the crouched position was a key suspect. The defense failed to show that identifying Almaraz's stance as a "shooter's crouch" was due to specialized knowledge or was a term of art used by the police. Furthermore, the court allowed the defense to re-cross examine Lieutenant Steele based on her statement, but defense counsel did not take advantage of that opportunity. The district court also provided the jury with a limiting instruction reminding the jury that they were not bound by any witness's testimony about the video. Therefore, we hold that Almaraz failed to show that the district court's admission of Lieutenant Steele's testimony was an abuse of discretion.

**E.      The District Court Did Not Abuse Its Discretion in Admitting the Expert Opinion Testimony of Grant Fredericks about when the Victim Was Shot**

The State called Grant Fredericks as an expert in forensic video analysis to assist the jury in interpreting enhanced versions of the bar's video surveillance from the night of the murder. During his testimony, the State asked Fredericks if he had formed an opinion about when Flores was shot and if he could identify that frame in the video. The defense objected, arguing that Fredericks' background in analyzing hundreds of videos was not a sufficient foundation to testify about a person's physiological reaction to being shot. The district court found that the State had laid a proper foundation and allowed Fredericks to give his opinion about the particular video frame that depicts the victim's response to being shot.

"The trial court has broad discretion in admitting expert evidence, and its judgment will not be disturbed on appeal absent a clear abuse of discretion." *Polk v. Larrabee*, 135 Idaho 303, 314, 17 P.3d 247, 258 (2000). Under I.R.E. 702, expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence

23

or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Furthermore, "the trial court has the discretion to determine whether a proper foundation has been laid for the admission of expert testimony." *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 593, 67 P.3d 68, 72 (2003) (citing *Perry v. Magic Valley Reg'l Med. Ctr.,* 134 Idaho 46, 995 P.2d 816 (2000)).

After reviewing the foundation laid by the State, this Court finds no error in the district court's determination that Fredericks was sufficiently qualified to give his expert opinion of when the impact of the shot occurred based on his experience and training in video analysis. Fredericks is a forensic video analyst who, in 1984, started a company assisting law enforcement with video-related investigations. He then became a police officer with the City of Vancouver Police Department in Canada, where he was the coordinator of the department's forensic video unit. Fredericks also trained other police officers on how to interpret videos throughout the United States and Canada. In 2000, Fredericks was hired by Avid Technology, the main imaging company for law enforcement, as the manager of the forensic video division. He primarily focuses on videos involving homicide, robbery, and kidnapping cases. When asked to describe his role as an expert, Fredericks responded as follows:

> I have examined thousands and thousands of videotapes over the past 25 years specifically for this purpose, to assist the jury and to accurately interpret the video. My experience is that because of my knowledge and skills and experience and my equipment – and I will spend many dozens, if not hundreds, of hours sometimes examining video – I'm able to see things that the average person wouldn't see right away. So I may be able to point out, this is what the camera shows, and then allow you to assess whether you can also see that. My experience is that if I were just to play it, you wouldn't see everything I see. That's – those are the skills I bear, to assist you. So my duty here is to assist you in accurately interpreting what the video's showing, answer any questions, technical questions about why the video looks the way it does, and to assist you following motion and the movement of individuals . . . .

This foundation was bolstered even further when Fredericks testified about his personal experience in the line of duty seeing people shot. In response to the defense's objection, Fredericks clarified his experience and stated that in addition to analyzing videos of homicides, "I've experienced firsthand, as a police officer people being shot. . . . I have been on the scene where my partner shot somebody, and I've experienced hearing shots and seeing somebody react to being shot."

24

This Court finds that such a foundation allowed the district court to determine that Fredericks was in fact qualified to give his opinion about which frame depicted the victim reacting to being shot. Fredericks was properly qualified to identify the precise moment captured on video based on his knowledge, training, skill, and experience in assisting law enforcement agencies in interpreting videos of crime. In explaining the basis for his opinion, Fredericks testified that at 2:19:50 there was no reaction from the victim. Then, at some point between 2:19:50 and 2:19:51, the victim reacted and you could see that reaction in the video by 2:19:51.[13] Fredericks stated "[h]is arms fly up. He moves forward. His chest comes out. His back is arched. Something has caused that – that to occur." Fredericks went on to describe that within a third of a second, virtually every patron in the bar reacted intensely and quickly. The totality of these reactions led Fredericks to opine that the shot was fired at the moment just before 2:19:51. Prior to this testimony, the district court also gave the jury a limiting instruction that ultimately the factual determinations about what the video depicts was left to the jury and they should weigh all the testimony regarding the video. As a result, this Court finds no error in the district court's determination that such testimony properly assisted the jury in interpreting the video. Therefore, Almaraz has failed to show that the district court abused its discretion in finding that the State properly laid a foundation to support Frederick's expert opinion.

## V. CONCLUSION

Based on the reasoning above, this Court holds that the district court abused its discretion in failing to suppress Hust's identification of Almaraz as the shooter, and abused its discretion in limiting Dr. Reisberg from testifying about the suggestiveness of the specific procedures the police employed during Hust's interview with Officer Sloan. This Court further holds that there was no other abuse of discretion committed by the district court on the remaining evidentiary issues Almaraz raises on appeal and we do not reach the issues of cumulative error or the denial of Almaraz's motion for new trial. Thus, this Court vacates Almaraz's conviction and remands for a new trial.

Justices EISMANN and HORTON, **CONCUR.**

Justice W. Jones, dissenting:

---

[13] The video surveillance cameras at Club 7 captured three frames per second. Therefore, Fredericks could only identify when Flores was shot within one-third of a second.

I would not lightly recommend that we send a man to the penitentiary for at least forty years, and possibly his entire life, where his trial was marred by error—and I fully join in that portion of the Majority's Opinion holding that the district court erred by admitting Hust's eyewitness identification, and erred again by limiting Dr. Reisberg's testimony regarding the unduly suggestive police questioning that led to that identification. Moreover, I cannot understand the State's inexplicable failure to brief the question of whether these two errors were harmless. This oversight ordinarily would preclude us from considering the issue of harmless error, because in most cases it would be unfair to decide this question without briefing and argument from counsel.

But, this is a unique case. Almaraz shot Flores in front of several eyewitnesses while being taped by a surveillance camera. Damning physical evidence also links him to the crime. If I believed a jury could possibly reach a different result in a new, error-free trial, I would not hesitate to join the Majority. But, I believe that in extraordinary cases like this one we have a duty to independently examine the record to determine whether all of the errors below were harmless, and, if they were, to affirm the defendant's conviction.

Typically, in a criminal appeal the government must argue that the errors below were harmless; otherwise, it waives that issue. *See Pizzuto v. State*, 146 Idaho 720, 725, 202 P.3d 642, 647 (2008) (party must support contentions on appeal with argument and authority); *State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010) (declining to address harmless error issue because State did not argue that error was harmless); *see also Miller v. Stovall*, 641 F. Supp. 2d 657, 665–66 (E.D. Mich. 2009) (same). However, a vast body of authority has developed following *United States v. Giovannetti*, 928 F.2d 225 (7th Cir. 1991) (per curiam), which held that such a waiver is not necessarily binding on an appellate court. *See, e.g.*, *Gover v. Perry*, 698 F.3d 295, 299–301 (6th Cir. 2012); *United States v. Ford*, 683 F.3d 761, 768–69 (7th Cir. 2012); *United States v. Ghane*, 673 F.3d 771, 787–88 (8th Cir. 2012); *United States v. Davis*, 596 F.3d 852, 861 (D.C. Cir. 2010); *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1101–02 (9th Cir. 2005); *United States v. Torrez-Ortega*, 184 F.3d 1128, 1136 (10th Cir. 1999); *United States v. Rose*, 104 F.3d 1408, 1414–15 (1st Cir. 1997); *United States v. Adams*, 1 F.3d 1566, 1575–76 (11th Cir. 1993); *United States v. Vontsteen*, 950 F.2d 1086, 1091–92 (5th Cir. 1992) (en banc); *People v. Casias*, No. 09CA1745, 2012 WL 3793188, at *10–11 (Colo. App. July 19, 2012); *Randolph v. United States*, 882 A.2d 210, 222–23 (D.C. 2005); *Edwards v. State*, 925 A.2d 1281,

1285 (Del. 2007); *Goodwin v. State*, 751 So. 2d 537, 546 (Fla. 1999); *State v. McKinney*, 777 N.W.2d 555, 561 (Neb. 2010); *Harlow v. State*, 70 P.3d 179, 194–95 (Wyo. 2003).

As originally articulated, the *Giovannetti* test includes three factors: (1) the length and complexity of the record, (2) the court's certainty that the errors were harmless, and (3) the time and expense that a futile retrial would entail. *See* 928 F.2d at 227. The inquiry focuses primarily on the second factor. *See United States v. Gonzalez-Flores*, 418 F.3d 1093, 1101 (9th Cir. 2005).[14] This approach appropriately accounts for the very real danger that attends any examination conducted without the benefit of adversarial briefing, while also interpreting Idaho's harmless error rule[15] in a manner that eliminates "unjustifiable expense and delay." I.C.R. 2; *see also Neder v. United States*, 527 U.S. 1, 18 (1999) (at some point, concern for method by which guilt is determined must yield to society's interest in punishing criminals); *United States v. Hasting*, 461 U.S. 499, 508–09 (1983) (noting impossibility of securing perfect trials for criminal defendants); *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (defendant has a constitutional right to a fair trial, not an error-free trial).

Admittedly, this Court has intimated that it will not examine sua sponte whether trial errors were harmless. *See State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010) ("The State has not argued that the error was harmless. Therefore, we vacate the judgment of conviction."). Two terse sentences devoid of citations to authority is a questionable "holding" at best, and nothing indicates that this Court was then aware of the *Giovannetti* line of cases.

Although this Court has often stated that issues not briefed or argued by the parties are waived, which is a good rule in the run of cases, it is impractical to retry cases where all of the errors below were plainly harmless. Moreover, if we adopt the *Giovannetti* test, we will eliminate the risk that the State might strategically omit a harmless-error argument in an effort to force us to reach a decision on one of the substantive issues involved in a case. If we assert our discretionary power to examine the record for harmless error *sua sponte*, such gamesmanship will be unavailing. *See United States v. Rose*, 104 F.3d 1408, 1414–15 (1st Cir. 1997) (noting

---

[14] One could well argue that the second "factor" is dispositive. If the record is long or complex, the court cannot be confident in its unguided determination of harmlessness. Therefore, the first factor is relevant only to the extent that it impacts the second factor. Moreover, time and expense can *never* justify depriving a defendant of a fair trial. Therefore, the third factor is relevant only if the second factor has already been established.

[15] "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52.

that "the interest in avoiding incentives to the government to fail to make the proper arguments" is one reason to adopt the *Giovannetti* test).

Here, the record is not so long or complex that it would be overly burdensome for us to review it for harmless error, particularly because the parties identified and thoroughly argued the errors, but "simply failed to address [their] likely impact on the final result." *United States v. Pryce*, 938 F.2d 1343, 1348 (D.C. Cir. 1991). Nor were the errors interwoven with other aspects of the State's case such that it would be difficult to evaluate their prejudicial effect. *See United States v. Samaniego*, 187 F.3d 1222, 1225 (10th Cir. 1999). Rather, both of the errors require us to answer a straightforward question: would this case have come out differently without Hust's eyewitness identification?

The answer clearly is "no." The State presented a large amount of evidence that was redundant with Hust's identification. Salazar and two other eyewitnesses testified that Almaraz shot Flores, and the bar's surveillance video shows Almaraz crouching behind Flores at the instant Flores was shot in the back. Following the murder, police officers searching near the bar found a shirt with Almaraz's DNA on it, in which was wrapped a gun that ballistics tests matched to the bullet casings from the shooting. This comports with Salazar's testimony that Almaraz told Salazar "I got him," wrapped his shirt around his gun, and then threw it over some bushes. Even without Hust's identification, the proof that Almaraz was the shooter is unassailable.

I am absolutely convinced that a jury will reconvict Almaraz if he is retried. The trial by jury is "one of the most sacred rights enjoyed by our people," *Russell v. Alt*, 12 Idaho 789, 88 P. 416, 417 (1907), particularly in criminal cases, where one's freedom or very life may be at stake, *see Neder v. United States*, 527 U.S. 1, 19 (1999). No one should be deprived of this sacred right out of mere concern for efficiency and expense. But, Almaraz has been fairly tried and found guilty, albeit with two errors that I believe far beyond a reasonable doubt had no effect on the guilty verdict. It has been held by the United States Supreme Court that a criminal defendant is entitled to a fair trial, not necessarily a perfect trial. Almaraz had a fair trial. I see no need to reverse his conviction in order to give him a *second* fair trial.

Justice J. Jones, concurs.