# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 41661

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2015 Opinion No. 34** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed:  June 15, 2015** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **KENNETH RANDALL SMITH,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County.  Hon. Fred M. Gibler, District Judge.

Judgments of conviction and sentences, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Ben P. McGreevy, Deputy Appellate Public Defender, Boise, for appellant.  Ben P. McGreevy argued.

Hon. Lawrence G. Wasden, Attorney General; Russell J. Spencer, Deputy Attorney General, Boise, for respondent.  Russell J. Spencer argued.

_____

WALTERS, Judge Pro Tem

Kenneth Randall Smith appeals from his judgments of conviction for possession of methamphetamine, aggravated assault, aggravated battery, and driving under the influence (DUI).  For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

This case consists of two incidents that were consolidated by the district court below for appeal.

### A.    Possession of Methamphetamine

At approximately 2:30 a.m. one August morning in 2012, Officer Patrick Cwik of the Coeur d'Alene Police Department pulled Smith over for failing to signal.  Upon contacting Smith, Officer Cwik saw a baton and a hatchet inside the vehicle and asked Smith to step

1

outside. Smith leaned against his trunk and removed his jacket, placing it on the trunk near him. After running Smith's information through dispatch, Officer Cwik was informed Smith had a history of physical altercations with law enforcement and that his driver's license was expired. Smith claimed to have a valid license and registration in the car and gave Officer Cwik permission to retrieve them.

Before entering the vehicle to find Smith's license and registration, Officer Cwik patted down Smith's jacket, which was still within Smith's reach. Inside a pocket the officer felt a "hard rectangular object," which, based on his training and experience, he believed may be a Taser. Smith denied it was a Taser, claimed it was a "sacred" item, and began to "get agitated and stepped towards" Officer Cwik. The officer removed the item from the jacket, revealing a hard rectangular object in a sock, the combination of which he recognized as "sort of a homemade, fashioned weapon." Officer Cwik shook out the sock to remove the object inside, which turned out to be a small container approximately the size of a pack of cigarettes. As he was doing so, the contents of the container spilled out, including syringes and a baggie with white residue. When asked by Officer Cwik, Smith admitted the items belonged to him, admitted to having used one of the syringes to inject methamphetamine at some point earlier in the evening, and admitted to having track marks on his arm. The officer seized the items, cited Smith for possession of drug paraphernalia, and released him. The white residue later tested positive for methamphetamine.

Smith was charged with possession of a controlled substance, Idaho Code § 37-2732(c)(1). He filed a motion to suppress, contending his detention was unlawfully extended, the frisk of his jacket was unlawful, and his statements admitting to ownership of the items in the container were elicited in violation of his *Miranda*[1] rights. Following a hearing, the district court denied the motion.

The State filed an amended information, adding an allegation that Smith was a persistent violator. Pursuant to a plea agreement, Smith entered a conditional guilty plea to the possession charge, reserving his right to appeal the denial of his motion to suppress. Among other things, the State agreed to dismiss the persistent violator sentencing enhancement. Smith now appeals the denial of his motion to suppress.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

**B.      Aggravated Assault, Aggravated Battery, DUI**

Approximately one month after the traffic stop discussed above, Smith dropped off a friend at an apartment complex, where two sisters later alleged that he physically shoved them with his chest. As a witness was calling 911, Smith drove away.

Sometime later, Alicia Sullivan and her husband, Bradley Brumbaugh, were at home when they heard a loud crash. Sullivan ran outside to investigate and saw a vehicle swerving down the middle of the road. Sullivan and Brumbaugh decided to follow in their vehicle in order to record its license plate number and report a possible DUI. Sullivan, who was driving, pulled the car up next to the swerving vehicle, which had stopped by the side of the road. Brumbaugh asked the driver, a man they later identified as Smith, if he was okay. Brumbaugh and Sullivan testified that Smith responded by swinging a large knife into their car and striking Brumbaugh in the neck, leaving a small mark. Sullivan drove away and the couple reported the incident to police. At trial, Smith testified he never threatened the couple and was merely attempting to show them the knife as a "gift" in an effort "to kind of defuse the situation."

Smith also engaged in a confrontation with another man at the scene, Thomas Moorhouse. Moorhouse testified that Smith began shouting at him and approaching him aggressively. As Smith became increasingly agitated and approached Moorhouse more quickly, Moorhouse began to retreat around the front of his vehicle. Smith, again brandishing the large knife, chased Moorhouse around his vehicle several times until Moorhouse's friend intervened and Smith left the scene. Moorhouse reported the incident to the police. Smith testified at trial that he did not threaten Moorhouse with the knife.

Police later located Smith, who was riding a bike. As they pursued him with their emergency overhead lights engaged, Smith fled and attempted to evade them. Eventually, police surrounded Smith, who reacted aggressively toward them until an officer subdued him by deploying a Taser gun. As Smith fell to the ground, he dropped a syringe and a pocket knife. Police also recovered the large knife said to be used against Brumbaugh and Moorhouse.

Smith was placed in the backseat of a patrol car, where video captured him chewing on the door of the vehicle. He was transported to Kootenai Medical Center where a warrantless blood draw was conducted. The results indicated Smith had recently used methamphetamine.

Smith was charged with aggravated assault, I.C. §§ 18-901, 18-905, 19-2514, for chasing Moorhouse with the large knife; aggravated battery, I.C. §§ 18-903, 18-907, 19-2514, for cutting

3

Brumbaugh with the knife; misdemeanor driving under the influence of methamphetamine, I.C. § 18-8004; two counts of battery, I.C. § 18-903, for shoving each of the sisters at the apartment complex; malicious injury to property, I.C. § 18-7001, for chewing on the patrol car door; possession of paraphernalia, I.C. § 37-2734A, for possession of the syringe; and resisting and obstructing arrest, I.C. § 18-705. The State also filed enhancements for the use of a deadly weapon, I.C. § 19-2520, and being a persistent violator, I.C. § 19-2514.

Smith filed a motion in limine to exclude certain evidence, including testimony relating to his prior conviction for burglary in Washington in 2000. The district court denied the motion. Smith then filed a motion to suppress the results of the test obtained following the warrantless blood draw. After a hearing, the district court denied the motion. Smith pled guilty to malicious injury to property, possession of paraphernalia, and resisting and obstructing an officer, but went to trial on the remaining counts. The jury found Smith guilty of aggravated battery, aggravated assault, and DUI, but acquitted him of the two battery charges. Smith now appeals the denial of his motion in limine and motion to suppress.

## II.

## ANALYSIS

### A. Possession of Methamphetamine

Smith contends the district court erred by denying his motion to suppress the methamphetamine found in his jacket because: (1) the stop was unlawfully extended; (2) the initial frisk of his jacket was unlawful; (3) even if the frisk was lawful, the removal of the container from the sock exceeded the scope of a valid frisk; and (4) Smith was not given *Miranda* warnings despite being in custody. The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

4

1. **Extension of traffic stop**

Smith contends the traffic stop was unlawfully extended because the officers abandoned the original purpose of the traffic stop (investigating the traffic violation) and began investigating a suspected DUI. There, he contends, the traffic stop "became no longer reasonably related in scope to the circumstances that justified the stop at its inception."

The stop of a vehicle constitutes a seizure of its occupants and is therefore subject to Fourth Amendment restraints. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *State v. Grantham*, 146 Idaho 490, 495-96, 198 P.3d 128, 133-34 (Ct. App. 2008). Because a traffic stop is limited in scope and duration, it is analogous to an investigative detention and is analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Prouse*, 440 U.S. at 653; *State v. Danney*, 153 Idaho 405, 409, 283 P.3d 722, 726 (2012); *Grantham*, 146 Idaho 490, 496, 198 P.3d 128, 134. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Danney*, 153 Idaho at 409, 283 P.3d at 726. There is no rigid time limit for determining when a detention has lasted longer than necessary; rather, a court must consider the scope of the detention and the law enforcement purposes to be served, as well as the duration of the stop. *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985); *Grantham*, 146 Idaho at 496, 198 P.3d at 134. Where a person is detained, the scope of detention must be carefully tailored to its underlying justification. *Grantham*, 146 Idaho at 496, 198 P.3d at 134.

The purpose of a stop, however, is not permanently fixed at the moment the stop is initiated, for during the course of the detention, there may evolve suspicion of criminality different from that which initially prompted the stop. *State v. Sheldon*, 139 Idaho 980, 984, 88 P.3d 1220, 1224 (Ct. App. 2003). Routine traffic stops may turn up suspicious circumstances which could justify an officer asking questions unrelated to the stop. *State v. Myers*, 118 Idaho 608, 613, 798 P.2d 453, 458 (Ct. App. 1990). The officer's observations, general inquiries, and events succeeding the stop may--and often do--give rise to legitimate reasons for particular lines of inquiry and further investigation by an officer. *Id.*

The district court rejected Smith's argument that the traffic stop was unlawfully extended, noting that the video recording of the stop made clear the reason for the extension of the stop beyond a routine traffic stop was that, when the officer asked Smith for his driver's license and proof of insurance, Smith produced an expired temporary license. He then told the

officer that his valid license and proof of insurance were in the vehicle and gave the officer permission to search the vehicle to find them.

Smith's argument on appeal that the district court's determination was erroneous fails to acknowledge the law that provided the basis for the district court's decision: that the purpose of a stop is not permanently fixed at the moment the stop is initiated, but that suspicious circumstances may arise which justify extension of the stop. *See Sheldon*, 139 Idaho at 984, 88 P.3d at 1224. Relatedly, he fails to acknowledge that his action in handing the officer an expired license extended the duration of the stop. The totality of the circumstances supports the court's decision. Accordingly, Smith has not shown the district court erred by determining the stop was not unlawfully extended.

### 2. Frisk

Smith contends that Officer Cwik's frisk of Smith's jacket was unlawful because the officer did not have reasonable suspicion that Smith was armed and dangerous or, in the alternative, even if the initial frisk was lawful, the subsequent removal of the container from the sock exceeded the permissible scope of such a frisk. Pursuant to *Terry*, an officer may frisk an individual if the officer can point to specific and articulable facts that would lead a reasonably prudent person to believe that the individual with whom the officer is dealing may be armed and presently dangerous and nothing in the initial stages of the encounter serves to dispel this belief. *Terry*, 392 U.S. at 27; *State v. Babb*, 133 Idaho 890, 892, 994 P.2d 633, 635 (Ct. App. 2000); *State v. Fleenor*, 133 Idaho 552, 555, 989 P.2d 784, 787 (Ct. App. 1999). In *State v. Bishop*, 146 Idaho 804, 203 P.3d 1203 (2009), the Supreme Court discussed several factors influencing whether a reasonable person in the officer's position would conclude that a particular person was armed and dangerous:

> whether there were any bulges in the suspect's clothing that resembled a weapon; whether the encounter took place late at night or in a high crime area; and whether the individual made threatening or furtive movements, indicated that he or she possessed a weapon, appeared nervous or agitated, appeared to be under the influence of alcohol or illegal drugs, was unwilling to cooperate, or had a reputation for being dangerous.

*Id.* at 819, 203 P.3d at 1218. Whether any of these considerations, taken together or by themselves, are enough to justify a *Terry* frisk depends on an analysis of the totality of the circumstances. *Bishop*, 146 Idaho at 819, 203 P.3d at 1218. Additionally, even if a frisk is

6

permitted under *Terry*, the scope of a frisk must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. *Terry*, 392 U.S. at 26.

In determining the officer had reasonable suspicion that Smith was armed and dangerous such that a frisk was warranted, the district court found the following facts: (1) the stop occurred late at night; (2) Officer Cwik had seen potential weapons, a baton and a hatchet, in the vehicle; (3) Smith exhibited threatening acts, including lunging toward the officer, and showed agitation and an unwillingness to cooperate; (4) the jacket was within easy reach of Smith; and (5) Officer Cwik was aware that Smith was known for violent offenses, including assault on an officer. On appeal, Smith does not contest these factual findings but merely argues, without elaborating, that these facts did not support a reasonable suspicion that he was armed and dangerous. We disagree. As the district court recognized, many of these factors were identified by the Supreme Court in *Bishop* as influencing whether a reasonable person in the officer's position would conclude that a particular person was armed and dangerous. Under the totality of the circumstances here, the district court did not err by determining Officer Cwik had the requisite suspicion to conduct a frisk of the jacket.

Smith also argues that even if the frisk was warranted, Officer Cwik's removal of the container from the sock went beyond the limited scope of a *Terry* frisk. Specifically, he contends that because the sock was in the officer's possession, it was not necessary for Officer Cwik to further examine it or remove its contents to identify whether it contained a weapon.[2] He analogizes this case to *State v. Faith*, 141 Idaho 728, 729, 117 P.3d 142, 143 (Ct. App. 2005), where, when performing a *Terry* frisk of the defendant, officers found an Altoids mint tin on his person, removed the tin, opened it, and found methamphetamine residue and drug paraphernalia. This Court first determined that because the officers could clearly feel that the Altoids tin itself was not a weapon, and it was highly unlikely Faith could have removed the tin from inside his front pocket while his hands were handcuffed behind his back (even if the tin had contained some kind of small instrument he could have used as a weapon), the officer's removal of the tin went beyond the permissible limits of a *Terry* frisk. *Faith*, 141 Idaho at 730, 117 P.3d at 144. We then continued, noting that even if the officers were justified in removing the tin for their

---

[2] The district court did not address this particular issue, although it was raised by Smith below.

protection or to prevent the suspect from escaping (apparently by utilizing an object in the tin), once the tin was in their possession, they were not entitled to open it: "If the officers thought that the Altoids box contained a razor blade or knife that could be used as a weapon or a means of escape, the officers simply could have withheld the tin from [the defendant]." *Id*.

The State counters on appeal, citing *Terry's* holding that the purpose of a frisk is to determine if the suspect is, in fact, carrying a weapon and, if so, to neutralize the threat of physical harm. *Terry*, 392 U.S. at 24. On this basis, the State argues that after the sock was removed from Smith's possession and was being controlled by the officer, the officer was allowed to then separate the sock from the container because the items together could be used as a deadly weapon and by doing so, "Officer Cwik neutralized the threatening weapon--which is the purpose of a *Terry* frisk." The State argues that *Faith* is distinguishable on the basis that the Altoids tin was not a weapon, whereas the sock/container combination in this case was (according to Officer Cwik's testimony). Given this difference, the State contends, "it was reasonable for the officer to neutralize that weapon by disassembling it."

We agree with the State that *Faith* is distinguishable because in that case, it was readily apparent to the officers that the Altoids tin was not a weapon whereas here, the sock/container combination was a potential weapon (based on Officer Cwik's testimony which the district court found credible and which was not challenged by Smith on appeal). In addition, Officer Cwik knew Smith had a history of physical altercations with law enforcement and Smith had become agitated and stepped toward Officer Cwik when the officer first questioned him in regard to the container. Under these circumstances, it was reasonable under *Terry* for Officer Cwik to remove the container from the sock.[3] Thus, the district court did not err by denying the motion to suppress in this regard.

### 3.     *Miranda* rights

Smith also contends that because he was not given his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), despite being in custody at the time, his statements in admitting ownership of the drug residue and paraphernalia must be suppressed. The requirement for *Miranda* warnings is triggered by custodial interrogation. *Id.*; *State v. Medrano*, 123 Idaho

---

[3]     As the State concedes, had Officer Cwik proceeded to deliberately open the container to examine its contents, this case could be analogized to *Faith*. However, the district court determined that the container simply fell open which then exposed the contents to Officer Cwik (which Smith does not challenge on appeal).

114, 117, 844 P.2d 1364, 1367 (Ct. App. 1992). "Custody" occurs when a person's freedom of action is curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Myers*, 118 Idaho at 610, 798 P.2d at 455. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994). To determine if a suspect is in custody, the only relevant inquiry is how a reasonable person in the suspect's position would have understood his or her situation. *Berkemer*, 468 U.S. at 442; *Myers*, 118 Idaho at 611, 798 P.2d at 456.

A court must consider all of the circumstances surrounding the interrogation. *Stansbury*, 511 U.S. at 322; *State v. James*, 148 Idaho 574, 577, 225 P.3d 1169, 1172 (2010). Factors to be considered may include the degree of restraint on the person's freedom of movement (including whether the person is placed in handcuffs), whether the subject is informed that the detention is more than temporary, the location and visibility of the interrogation, whether other individuals were present, the number of questions asked, the duration of the interrogation or detention, the time of the interrogation, the number of officers present, the number of officers involved in the interrogation, the conduct of the officers, and the nature and manner of the questioning. *See Berkemer*, 468 U.S. at 441-42; *James*, 148 Idaho at 577-78, 225 P.3d at 1172-73. The burden of showing custody rests on the defendant seeking to exclude evidence based on a failure to administer *Miranda* warnings. *James*, 148 Idaho at 577, 225 P.3d at 1172.

The district court rejected Smith's motion to suppress on this ground, determining that based on the totality of the circumstances, Smith was not in custody at the time:

> Mr. Smith was not arrested. He was not handcuffed. He was not placed in a police car. The questioning took place in an open space between the police car and the defendant's car. There were two policemen present. But it appears from the video that only one officer questioned the defendant, at least . . . insofar as the *Miranda* issues are concerned. . . . The questioning took only a few minutes, and it was not prolonged, and he was released following the questioning.

On appeal, Smith argues the district court was incorrect in determining he was not in custody. Although recognizing that generally a person detained as a result of a traffic stop is not considered to be in custody for purposes of *Miranda*, he contends that he was subject to treatment thereafter that rendered him in custody. *See Berkemer*, 468 U.S. at 437, 440. He argues that a reasonable person in his position would not have felt free to leave, specifically

9

pointing out that although he was not ultimately arrested, Officer Cwik could not recall having returned Smith's identification; that "unlike a typical traffic stop, Mr. Smith's detention occurred at around 2:30 in the morning . . . meaning that it was unlikely that the public would witness the interaction between Mr. Smith and the officers and thereby help safeguard Mr. Smith's rights"; and the subject of the inquiry was in regard to drugs and therefore was not related to the original purpose for the stop (a traffic violation).

Smith's contentions are unavailing. That Officer Cwik changed the focus of his questioning does not indicate Smith was in custody; the officer's finding of syringes and a baggie with white residue in a container that was in Smith's jacket justified the officer asking questions unrelated to the stop. *See Myers*, 118 Idaho at 613, 798 P.2d at 458. Nor has Smith shown that the facts that the officer may not have returned his identification or that the questioning took place in the early morning hours overcame the myriad of other facts identified by the district court as indicating that Smith was not in custody. Thus, Smith has not carried his burden to show he was in custody such that *Miranda* protections applied. The district court did not err by denying his motion to suppress on that basis.

**B.      Aggravated Assault, Aggravated Battery, and DUI**

In this separate case, Smith contends the district court erred by denying his motion to suppress his blood test results because the warrantless blood draw violated his Fourth Amendment rights. He also contends the district court abused its discretion by denying his motion in limine and permitting the State to impeach his credibility at trial with his prior conviction for burglary.

**1.      Motion to suppress**

Prior to the district court's ruling on Smith's motion to suppress, the parties stipulated that Smith "didn't consent to the blood draw." The district court denied the motion, however, determining that under Idaho's implied consent statute, Smith gave his consent to the blood draw by taking advantage of the privilege of driving on Idaho's roads and, based on Idaho law at the time, this consent was irrevocable.

Requiring a person to submit to a blood draw for evidentiary testing is a search and seizure under the Fourth Amendment to the United States Constitution and Article I, Section 17 of the Idaho Constitution. *Schmerber v. California*, 384 U.S. 757, 767 (1966); *State v. Wulff*, 157 Idaho 416, 418, 337 P.3d 575, 577 (2014). Therefore, warrantless forced blood draws are

10

generally violative of the state and federal constitutions. *Missouri v. McNeely*, ___ U.S. ___, ___, 133 S. Ct. 1552, 1558 (2013); *Wulff*, 157 Idaho at 419, 337 P.3d at 578. However, the warrant requirement does not apply if the person subjected to the search has consented. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *State v. Dominguez*, 137 Idaho 681, 683, 52 P.3d 325, 327 (Ct. App. 2002). Consent must be voluntary and not the result of duress or coercion, either direct or implied. *Schneckloth*, 412 U.S. at 248; *State v. Whiteley*, 124 Idaho 261, 264, 858 P.2d 800, 803 (Ct. App. 1993). The voluntariness of an individual's consent is evaluated in light of all the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *Schneckloth*, 412 U.S. at 226-27; *State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052, 1057 (2003); *Whiteley*, 124 Idaho at 264, 858 P.2d at 803. Mere acquiescence to a claim of authority by a law enforcement officer does not constitute consent. *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968); *State v. Smith*, 144 Idaho 482, 488, 163 P.3d 1194, 1200 (2007); *State v. Tietsort*, 145 Idaho 112, 118, 175 P.3d 801, 807 (Ct. App. 2007). Whether consent was granted voluntarily, or was a product of coercion, is a question of fact to be determined by all the surrounding circumstances. *Hansen*, 138 Idaho at 796, 69 P.3d at 1057. The State bears the burden to prove consent by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *Hansen*, 138 Idaho at 796, 69 P.3d at 1057; *State v. Kilby*, 130 Idaho 747, 749, 947 P.2d 420, 422 (Ct. App. 1997).

Consent, once given, may also be revoked, for "[i]nherent in the requirement that consent be voluntary is the right of the person to withdraw that consent." *State v. Halseth*, 157 Idaho 643, 646, 339 P.3d 368, 371 (2014). Thus, after a defendant has revoked consent, officers no longer may act pursuant to that initial voluntary consent. *State v. Thorpe*, 141 Idaho 151, 154, 106 P.3d 477, 480 (Ct. App. 2004). Of course, an individual may renew his consent after revoking it. *Id*.

Below, the district court relied upon Idaho's implied consent statute, I.C. § 18-8002(1), which states that "any person who drives or is in actual physical control of a motor vehicle in this state shall be deemed to have given his consent to evidentiary testing for concentration of alcohol." At the time of the proceedings below, Idaho Supreme Court precedent held that this statutorily implied consent satisfied the consent exception to the constitutional warrant requirement. *State v. Diaz*, 144 Idaho 300, 303, 160 P.3d 739, 742 (2007), *overruled by Wulff*, 157 Idaho 416, 337 P.3d 575. Additionally, and in contravention of the general rule that consent

11

may be withdrawn or revoked, our Supreme Court had held that actions or statements revoking implied consent were ineffective. *State v. Woolery*, 116 Idaho 368, 373, 775 P.2d 1210, 1215 (1989), *overruled by Wulff*, 157 Idaho 416, 337 P.3d 575. These points of law have recently changed, however. In a series of recent decisions, the Idaho Supreme Court reexamined its application of Idaho's implied consent statute in light of the United States Supreme Court's decision in *McNeely*, ____ U.S. ____, 133 S. Ct. 1552.

In *Wulff*, our Supreme Court held that the district court "properly concluded that Idaho's implied consent statute was not a valid exception to the warrant requirement." *Wulff*, 157 Idaho at 423, 337 P.3d at 582. At first glance, this holding would appear to preclude the State from continuing to rely on the implied consent statute to provide the requisite consent for a warrantless blood draw in a suspected DUI case. However, in addressing the constitutionality of the statute, the *Wulff* Court made a salient distinction. It identified "two hurdles" the statutory consent must overcome to "qualify as voluntary: (1) drivers give their initial consent voluntarily and (2) drivers must continue to give voluntary consent." *Id*. The Court considered that the first hurdle was met by the statute: "Drivers in Idaho give their initial consent to evidentiary testing by driving on Idaho roads *voluntarily*." *Id*. (emphasis added) (citing *Diaz*, 144 Idaho at 303, 160 P.3d at 742). It was the second hurdle the court found problematic, noting that Idaho appellate decisions interpreting section 18-8002 had held that a person could not revoke his statutorily implied consent. "Because Idaho does not recognize a driver's right to revoke his implied consent," the Court held, "Idaho has a per se exception to the warrant requirement." *Wulff*, 157 Idaho at 423, 337 P.3d at 582.[4] Thus, the Court held, it was overruling previous case law "to the extent that they applied Idaho's implied consent statute as an irrevocable per se rule that constitutionally allowed forced warrantless blood draws." *Id*.

That Idaho's implied consent statute continues to be valid, albeit in a form that is revocable, is supported by two subsequent cases issued by our Supreme Court. Approximately one month after *Wulff*, the Court decided *Halseth*, 157 Idaho 643, 339 P.3d 368, holding:

---

[4] Earlier in the opinion, the Court also focused on the irrevocability of the statute: "A holding that the consent implied by statute is irrevocable would be utterly inconsistent with the language in *McNeely* denouncing categorical rules that allow warrantless forced blood draws." *Wulff*, 157 Idaho at 422, 337 P.3d at 581.

> [A]n implied consent statute such as . . . Idaho's does not justify a warrantless blood draw from a driver who refuses to consent . . . or objects to the blood draw . . . . Inherent in the requirement that consent be voluntary is the right of the person to withdraw that consent.

*Id.* at 646, 339 P.3d at 371.[5] Then, several weeks later in *State v. Arrotta*, 157 Idaho 773, 774, 339 P.3d 1177, 1178 (2014), the Court cited to *Wulff* and *Halseth* for the proposition that "a suspect can withdraw his or her statutorily implied consent to a test for the presence of alcohol." Taken together, these decisions lead to the conclusion that Idaho's law regarding statutorily implied consent retains validity, but that consent may be terminated by a defendant's refusal, protest, or objection to alcohol concentration testing.

We turn to the application of the facts in this case to the current state of the law. As noted above, the parties stipulated that Smith "didn't consent to the blood draw." This stipulation is somewhat ambiguous as alone it does not make clear whether the lack of consent came in the form of affirmative resistance to the blood draw (as in *Halseth)* or whether Smith acquiesced to the blood draw without giving affirmative consent. The context of defense counsel's statements at the motion to suppress hearing suggest it was the latter:

> [Defense counsel]: Your Honor, I also just want to make clear for the record that there's been a stipulation that the search in this case was done without a warrant; so the blood draw was done without a warrant. And also that Mr. Smith didn't consent to the blood draw. That's also a stipulation between the parties.
> [The Court]: Unless there was an implied consent.
> [Defense counsel]: That's correct.

Thus, defense counsel agreed that if implied consent applies, Smith did give the requisite consent.[6] Since we have concluded that implied consent continues to exist in Idaho, pursuant to the stipulation, such consent was present here. Thus, the district court did not err by denying Smith's motion to suppress the results of the warrantless blood draw.[7]

---

[5]     *Halseth* does not cite to or reference *Wulff*.

[6]     This interpretation is supported by the officer's testimony at trial that Smith "cooperated with the nurse" drawing his blood.

[7]     We note that at oral argument, this Court raised the prospect of remanding the case for further development of the evidentiary record in regard to Smith's consent (or lack of) to the blood draw. Smith, however, affirmatively rejected this option.

13

## 2.	Motion in limine

Smith contends the district court abused its discretion by denying his motion in limine and permitting the State to impeach Smith's credibility with his prior conviction in Washington for burglary. Specifically, he contends the district court did not weigh the probative value of the evidence against its unfair prejudicial effect.

In his motion in limine, Smith contended that his 2000 Washington conviction for first degree burglary was inadmissible because "the nature of the conviction is not relevant to the witness's credibility and the probative value of the evidence is substantially outweighed by its prejudicial impact." At the hearing on his motion, he argued the probative value of the conviction was outweighed by its prejudicial effect, based on factors used by the federal courts in this balancing test: the conviction was "stale," it was not similar to the charges Smith was facing, and Smith's credibility was not central to the State's case. The district court denied the motion:

> Burglary is within the second category, which is--it's all discretionary with me, but the conviction for burglary does weigh on credibility.
> So given the fact it is within the ten-year period . . . and the fact it can bear on credibility, I'm going to deny the motion in limine with respect to the burglary conviction.

The "second category" appears to be in reference to the Supreme Court's decision in *State v. Ybarra*, 102 Idaho 573, 580-81, 634 P.2d 435, 442-43 (1981), which the State referenced at the hearing and which held that crimes such as burglary can be relevant to credibility. At trial, the district court clarified its ruling prior to Smith taking the stand:

> [I]f [Smith] does testify, the State will be allowed to impeach him by asking if he was previously convicted of a felony. If the answer is yes, that is [the] end of the inquiry. If the answer is no, then the State would be entitled to go into--present evidence regarding the prior conviction.

At trial, the evidence came in when the State opened its cross-examination of Smith by asking if he was a convicted felon, to which Smith replied he was. On redirect examination, Smith testified he had been convicted of burglary in 2000.

In relevant part, Idaho Rule of Evidence 609(a) provides:

> For the purposes of attacking the credibility of a witness, evidence of the fact that the witness has been convicted of a felony and the nature of the felony shall be admitted if elicited from the witness or established by public record, but only if the court determines in a hearing outside the presence of the jury that the fact of

the prior conviction or the nature of the prior conviction, or both, are relevant to the credibility of the witness and that the probative value of admitting this evidence outweighs its prejudicial effect to the party offering the witness.[8]

The determination of whether evidence of a witness's prior conviction of a crime will be admitted under I.R.E. 609 involves a two-tiered inquiry. The court must first consider whether the previous conviction is relevant to the witness's credibility; and second whether its probative value outweighs its unfair prejudicial effect. *State v. Trejo*, 132 Idaho 872, 876, 979 P.2d 1230, 1234 (Ct. App. 1999).

It is true that the district court did not specifically articulate a finding regarding the probative and prejudicial nature of the conviction. However, any error was harmless. The Idaho Criminal Rules provide that any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. I.C.R. 52. The inquiry is whether, beyond a reasonable doubt, a rational jury would have convicted the defendant even without the admission of the challenged evidence. *Chapman v. California*, 386 U.S. 18, 24 (1967); *State v. Johnson*, 148 Idaho 664, 669, 227 P.3d 918, 923 (2010). To show an error is harmless, the State must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010). Thus, an appellate court's inquiry whether the verdict would have been the same without the error. *State v. Almaraz*, 154 Idaho 584, 598, 301 P.2d 242, 256 (2013).

At trial, Moorhouse, Brumbaugh, and Sullivan corroborated each other's testimony that Smith acted aggressively towards them. Additionally, the State offered a photograph of a puncture wound on Brumbaugh's neck and Smith himself testified he had fled from the scene and continued to flee even after he knew the police were chasing him, despite his testimony that he had not acted aggressively toward Moorhouse and had merely shown Brumbaugh and Sullivan the knife as a "gift." Further, even apart from the burglary conviction, the jury knew Smith was not a law-abiding citizen: they were presented with evidence that he tested positive for methamphetamine and Smith himself testified he was a methamphetamine addict and had

---

[8]    Idaho Rule of Evidence 609 provides that evidence of a conviction is not admissible if a period of more than ten years has elapsed since the date of the conviction or the release of the defendant from confinement. During the hearing on Smith's motion in limine, it was established that Smith's release from confinement on the 2000 conviction was in 2005, within ten years of the trial in the instant proceeding. Thus, timeliness has not been raised as an issue in this appeal.

previously been in prison. The scope of the State's reference to the prior conviction was strictly limited by the district court and at trial, proved to be very brief. And, when Smith testified as to the nature of the felony and that it had been in 2000, the jury heard that it had not been a crime of violence against a person (as he was charged with in this case) and was relatively old, having occurred approximately twelve years earlier. Given these circumstances, we are convinced beyond a reasonable doubt that the error complained of did not contribute to the verdicts obtained, and thus no reversible error occurred.

## III.

## CONCLUSION

The district court did not err by denying Smith's motion to suppress in regard to his possession of methamphetamine charge because: (1) the traffic stop was not unlawfully extended because suspicious circumstances arose which justified the extension of the stop; (2) the initial frisk of his jacket was justified because the officer had reasonable suspicion that he was armed and dangerous; (3) the removal of the container from the sock found in Smith's jacket was reasonable under the totality of the circumstances; and (4) Smith was not in custody such that *Miranda* protections applied at the time he claimed ownership of the drug residue and paraphernalia found in the container.

With regard to the charge of driving under the influence, the district court did not err by denying Smith's motion to suppress the results of his warrantless blood draw because Smith did not show that he revoked his implied consent. Additionally, even if we assume the district court erred by denying Smith's motion in limine to prevent the State from utilizing Smith's prior burglary conviction, any error was harmless. Smith's judgment of conviction for possession of methamphetamine and judgment of conviction for aggravated assault, aggravated battery, and driving under the influence are affirmed.

Judge GRATTON **CONCURS**.

Judge LANSING, **SPECIALLY CONCURRING**.

I join in all parts of the foregoing opinion, but as to Section II(B)(1) I write separately to address the viability of statutory implied consent to satisfy constitutional protections against warrantless searches. I join in Section II(b)(1) because it adheres to precedents of the Idaho Supreme Court, including *State v. Wulff*, 157 Idaho 416, 337 P.3d 575 (2014). In that opinion, the Supreme Court held that warrantless blood draws conducted under Idaho's implied consent

16

statute would qualify as voluntary if: (1) drivers give their initial consent voluntarily and (2) drivers continue to give voluntary consent. *Id.* at 423, 337 P.3d at 582. The Court went on to say that "drivers in Idaho give their initial consent to evidentiary testing by driving on Idaho roads voluntarily." *Id.* Two subsequent decisions, *State v. Halseth*, 157 Idaho 643, 339 P.3d 368 (2014) and *State v. Arrotta*, 157 Idaho 773, 339 P.3d 1177 (2014), appear to adhere to that holding that the implied consent framed by I.C. § 18-8002(1) constitutes voluntary consent and satisfies constitutional safeguards against warrantless searches unless the implied consent has been withdrawn. Were I not obligated to adhere to those mandatory precedents, I would hold the "implied consent" imposed by I.C. § 18-8002(1) does not constitute consent that will serve as an exception to the prohibitions against warrantless searches and seizures found in the Fourth Amendment to the United States Constitution and Article I, Section 17 of the Idaho Constitution.

In my view, the consent exception requires actual consent from the person seized or searched. While that consent may be verbal or conveyed by gestures or other conduct, it must be actual consent. *United States v. Chavez*, 328 F.3d 974, 978 (8th Cir. 2003) ("Consent may be express or implied, but in either case, there must be actual consent."); *State v. Smith*, 144 Idaho 482, 488, 163 P.3d 1194, 1200 (2007) (holding acquiescence is not "voluntary consent"); *State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052, 1057 (2003) (holding that consent acts as an exception to the warrant requirement only when "voluntarily granted by someone with authority"); *State v. Kapelle*, 158 Idaho 121, 128, 344 P.3d 901, 908 (Ct. App. 2014) ("Consent to search may be in the form of words, gestures, or conduct."). The "implied consent" constructed by I.C. § 18-8002(1) involves no actual consent at all; the so-called consent is entirely fictitious. No driver is actually asked to consent to alcohol concentration testing before he or she undertakes to drive in Idaho. The implied consent is a legal fiction created by statute which, in my opinion, cannot trump constitutional guarantees against warrantless intrusions on one's person or liberty. A legislative body may not simply legislate away constitutional rights.

It may not offend the Fourth Amendment for state laws like I.C. § 18-8002(4) to impose a civil penalty, such as suspension of driving privileges, if a driver who is suspected of intoxication refuses to submit to an alcohol concentration test. *See Missouri v. McNeely*, __ U.S. ___, ___, 133 S. Ct. 1552, 1566-67 (2013) (discussing statutory implied consent schemes that impose administrative penalties for refusal of an alcohol concentration test and that allow admission of a defendant's refusal into evidence); *South Dakota v. Neville*, 459 U.S. 553, 554

17

(1983) (holding that implied consent schemes that allow the State to admit a refusal to submit to testing into evidence do not violate the Fifth Amendment); *State v. Declerck*, 317 P.3d 794, 803 (Kan. Ct. App. 2014) (accepting the proposition that the implied consent statute compels a person to choose between giving actual consent or submitting to administrative penalties, but rejecting the view that implied consent amounts to an exception to the warrant requirement); *State v. Padley*, 849 N.W.2d 867, 876 (Wis. Ct. App. 2014) (stating that "a proper implied consent law authorizes law enforcement to present drivers with a difficult, but permissible, choice between consent or penalties for violating the implied consent law" and rejecting the view that implied consent amounts to an exception to the warrant requirement). Civil penalties for refusal provide a powerful incentive for drivers to *actually* consent to a test. That the driver is thereby presented with a difficult choice may not necessarily render the consent involuntary for, "the criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGautha v. California*, 402 U.S. 183, 213 (1971) (quoting *McMahon v. Richardson*, 397 U.S. 759, 769 (1970)), *vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972); *see also McKune v. Lile*, 536 U.S. 24, 41 (2002); *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995) (the "difficult choices" inherent in the plea bargaining process do not necessarily result in coercion); *Smith*, 144 Idaho at 488, 163 P.3d at 1200 (presenting a defendant with lawful options, even undesirable ones, does not render a consent involuntary). This does not mean, however, that consent may be fictitiously deemed to have been given in advance by every person who drives in Idaho and that constitutional standards are satisfied by this imaginary consent. In my view, when no actual consent is expressed, orally or otherwise, to a request for submission to an alcohol concentration test, then there is no consent that will satisfy the Fourth Amendment or the Idaho Constitution.

Like Idaho, many states have adopted some version of an implied consent statute that imposes penalties for refusal to submit to alcohol concentration testing at the reasonable request of an officer, but my research has revealed no other jurisdiction where, at least after the United States Supreme Court's decision in *McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013), the fictitious implied consent was held to satisfy the Fourth Amendment for purposes of a blood draw.[1] The

---

[1] *See, e.g.*, *State v. Butler*, 302 P.3d 609, 613 (Ariz. 2013); *People v. Schaufele*, 325 P.3d 1060, 1065-66 (Colo. 2014); *Flonnory v. State*, 109 A.3d 1060, 1065 (Del. 2015); *Williams v. State*, ___ So. 3d ___ (Fla. 2015); *People v. Gaede*, 20 N.E.3d 1266, 1270 (Ill. App. Ct. 2014);

Idaho Supreme Court has taken a different view, however, and therefore I concur in this Court's opinion here.

---

*State v. Declerck*, 317 P.3d 794, 803-04 (Kan. Ct. App. 2014); *State v. Fierro*, 853 N.W.2d 235, 243 (S.D. 2014); *Sutherland v. State*, 436 S.W.3d 28, 38, 41 (Tex. Ct. App. 2014); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. Ct. App. 2014) *rev. pending*; *State v. Padley*, 849 N.W.2d 867, 879 (Wis. Ct. App. 2014). In *State v. Won*, 332 P.3d 661 (Haw. Ct. App. 2014), *rev. pending*, the court rejected a Fourth Amendment challenge to Hawaii's implied consent statute as applied to a breath test. However, the Hawaiian statute differs significantly from I.C. § 18-8002(1) in that it provides that, except in circumstances not applicable in *Won*, if the driver refuses to submit to breath, blood, or urine testing, "none shall be given." *Id.* at 666. The Hawaiian statutory scheme "protects the driver from being physically forced to undergo testing, but imposes sanctions on the driver's exercise of that option." *Id.* at 681. It thereby differs from Idaho's statute, under which Smith was physically forced to undergo a blood test. In *Won*, the defendant acquiesced and actively participated in a breath test, thereby giving a form of actual consent. Therefore, the statute, as applied in *Won*, does not rely upon fictitious implied consent. Moreover, the Hawaiian court emphasized that because Won chose to take a breath test, "we only address the constitutionality of [the statute] as it applies to breath tests under the implied consent statutory scheme" in a typical DUI case. *Id.* at 679. The *Won* decision leaves unresolved whether Hawaii's implied consent statute would be found compliant with the Fourth Amendment in a case where the defendant was subjected to a blood draw without his actual consent.